Fabricant, J.
INTRODUCTION
These three consolidated actions for review of arbitration awards present overlapping issues regarding the effect of the Education Reform Act of 1993 on teacher transfer provisions contained in the collective bargaining agreement between Lowell and its teachers’ union. This Court previously ruled on some of these issues in Civil Action No. 96-07012 [6 Mass. L. Rptr. 591], denying the City’s application for stay of arbitration of the dispute that is now presented in No. 97-3410. All three arbitration proceedings resulted in awards ordering the City to approve certain transfers. The City now seeks to vacate these awards; the Union seeks to confirm them. For the reasons that will be explained, the Court will vacate the award in No. 97-3410, confirm part and vacate part of the award in No. 99-3553, and confirm part and vacate part of the award in No. 99-5476, ordering that matter remanded to the arbitrator for redetermination of the remedy.
BACKGROUND
The background most pertinent to the issues presently before the Court consists of the applicable provisions of the collective bargaining agreement and of the governing statute. The Collective Bargaining Agreement, executed between the Lowell School Committee and the United Teachers of Lowell, provides for teacher transfers in Article XXVIII(A), as follows:[1]
1. All teaching vacancies which arise between May 16 of one school year to April 30 of the next school year shall be posted in the May 1 Compendium. Additions and/or deletions to the May 1 Compendium shall be posted as they arise in an Addendum prior to May 15.
2. Requests for transfers shall be submitted in writing and renewed annually no later than May 15 to the Superintendent. Requests shall include the grade and/or subject area and school(s), in order of preference, to which the teacher seeks assignment. Only permanent teachers are eligible for transfers.
3. When a transfer is to be made, a teacher’s background, certification, quality of teaching performance, skills required by the job, and length of service in the Lowell School system shall be consid- . ered. If all other variables are equal, length of service in the system shall be the controlling factor.
4. All teachers requesting a transfer shall receive a written statement as to the disposition of their request by June 30th. Only one transfer per teacher can be honored for a given school year.
All positions that become vacant after May 15 or any positions that are created after May 15 shall be filled by long-term substitutes and these positions shall appear on the May 1 Compendium of the following year.
5.Decisions by the Superintendent, or his designee, are final, unless arbitrary or capricious.
Also in issue in these cases is the grievance procedure provided in Article III of the agreement, which establishes a process for resolution of any complaint of an alleged violation of the agreement, or “a dispute involving the meaning, the interpretation, or the application thereof.” Article III provides a five-level process, beginning with an attempt at “informal settlement between the teacher and his immediate superior,” proceeding to written presentation to the superior, then referral to the superintendent, who meets with the aggrieved teacher and the union representative. If these three levels fail to achieve resolution, the process moves to “Level Four,” consisting of referral to the school committee, which must meet with the union’s grievance committee. If that fails, the union may “refer the unsettled grievance to arbitration.”
As the language of these collective bargaining provisions suggests, Massachusetts law formerly assigned to school committees authority for hiring of teachers. G.L.c. 71, §59B, as enacted by St. 1973, c. 421. In 1993, however, the Legislature reassigned that authority to each school’s principal by enactment of the Education Reform Act, St. 1993, c. 71, §53. As amended by that Act, G.L.c. 71, §59B, provides, in pertinent part:
Principals . . . shall be the educational administrators and managers of their schools and shall supervise the operation and management of their schools and school property, subject to the supervision and direction of the superintendent. Principals ... shall be responsible, consistent with district personnel policies and budgetary restrictions and subject to approval of the superintendent, for hiring all teachers, athletic coaches,[2] instructional or administrative aides, and other personnel assigned to the school, and for terminating all such personnel, subject to review and prior approval by the superintendent and subject to the provisions of this chapter.
The school superintendent of a city or town or regional school district including vocational/technical schools, may also appoint administrators and other personnel not assigned to particular schools, at levels of compensation determined in accordance with policies established by the school committee.
This statutory reallocation of authority gave rise to the question that is at the heart of these cases: whether, and to what extent, a school committee has the power to constrain a principal’s hiring authority by entering into a collective bargaining agreement that grants teachers certain contractual rights with respect *674 to transfers from one school to another within the district. The issue first arose in Lowell in 1996, when the union filed a grievance, pursuant to Article III of the collective bargaining agreement, challenging the decisions of certain school principals to fill certain vacancies by hiring new teachers from outside the Lowell system, despite the requests of certain teachers already employed by the City to fill the positions by transfer. When the first three levels of the grievance procedure did not achieve resolution, the Union demanded a meeting with the School Committee, as provided by Level Four. The School Committee refused, taking the position that c. 71, §59B, superceded Article XXVIIKA) in its entirety, rendering the dispute outside the scope of the grievance procedure. The Union then demanded arbitration, to which the City responded by filing Civil Action No. 96-07012, seeking a stay of arbitration.
On cross-motions for summary judgment in that case, this Court issued a memorandum of decision dated April 24, 1997 [6 Mass. L. Rptr. 591]. The Court concluded, for reasons fully explained in that memorandum, that each principal’s authority over hiring, as established in c. 71, §59B, includes the filling of all positions within the school, whether by hiring from outside the school system or by transfer from other schools in the system. The Court further concluded that the statutory reference to “district personnel policies” authorizes school committees to require compliance with specified procedures, but not to impose substantive constraints that would effectively deprive principals of the discretion granted to them by the statute. Thus, the Court concluded that Article XXVIIKA) of the collective bargaining agreement, if construed to require principals to fill vacancies by granting transfer requests in preference to other applicants, would conflict with c. 71, §59B, and would therefore be superceded by that statutory provision. The Court nevertheless denied the City’s request for stay of arbitration, because it was of the view that Article XXVIIKA) was susceptible of an interpretation that would impose only procedural requirements, leaving the principals’ discretion intact, and therefore would not conflict with the statute. Since authority to construe the collective bargaining agreement rests with the arbitrator, the Court ordered that the arbitration proceed, subject to judicial review of any award that might ultimately enter, as provided by law.
Arbitration proceeded on April 14, 1997, before Arbitrator Diane Zaar Cochran, based on a stipulation of facts “in lieu of testimony.” The parties stipulated, as to each of two grievants, that she was the sole applicant for transfer to the position, that she applied in accordance with Article XXVIIKA), that she had the necessary qualifications and certifications, that her transfer application was denied, and that each position was then filled, in one case by a person new to the Lowell school system, and in the other by a person from within the system who was not eligible for transfer under Article XXVIIKA).
Arbitrator Cochran issued her written decision on May 23, 1997. After reciting the stipulated facts and summarizing each party's position, she stated her conclusion, as follows:
There is essentially no dispute on the merits. If I find the matter substantively arbitrable, the Union must prevail on the merits. The Committee concedes that the voluntary transfer procedure of Article XXVIII was not followed. The grievants were the sole applicants for the positions, their requests were timely, these were lateral transfers and they were qualified for their positions. The principals’ decisions ignored the contractual transfer rights and negotiated procedures in making the determinations to deny the lateral transfers, were arbitrary and capricious, and directly violate Article XXVIII A.5.
The Arbitrator then addressed and rejected the City’s legal arguments under c. 71, §59B. She ruled that “a transfer cannot be considered the hiring of a teacher,” and that even if it could, the statutory requirement that principals act “consistent with district personnel policies” includes “negotiated collective bargaining agreements.” Accordingly, Arbitrator Cochran ruled, Article XXVHI(A), even as she construed it, did not conflict with the statute.[3] Finding violations of the agreement both in the denial of the transfers and in the school committee’s refusal to meet to hear the grievance at level four of the grievance procedure, Arbitrator Cochran ordered that “(a]s remedy, the Grievants shall be granted their requested lateral transfers.” On July 1, 1999, the City filed Civil Action No. 97-3410, seeking to vacate Arbitrator Cochran’s award. The Union responded with a counterclaim seeking confirmation of the award.[4]
The following year, three more teachers grieved the denial of applications for transfer. Again the School Committee refused to meet with the Union pursuant to level four of the grievance procedure, and the Union referred the grievance to arbitration. Arbitrator Richard Boulanger conducted an evidentiary hearing on October 5-6, 1998, and issued a written decision dated June 11, 1999.
Arbitrator Boulanger made findings regarding the denial of transfer requests of Jill Lerer, Bertha Vargas, and Norman Ham, as follows. Lerer was the sole transfer applicant for a first grade Spanish bilingual position at the Cardinal O’Connell School. She had taught bilingual Spanish in Lowell elementary schools for twenty-two years, and held all certifications necessary for the position. Principal Mary Brown-Smith interviewed her, with the assistance of a selection committee. The Committee reported that her “answers to questions were tentative and somewhat vague” and that she “was not acquainted with the philosophy of the Cardinal O’Connell School nor was she able to give *675 an adequate reason for wanting to be part of our school community.” The principal denied the transfer request, and chose instead an outside candidate who, although certified in other subjects, did not hold the certification required for this position, necessitating an application to the Commissioner of Education for waiver of the certification requirement.
Bertha Vargas applied for transfer to a Spanish position at Lowell High School, for which she held the required certification. She had taught in three Lowell schools over twelve years. Principal William Samaras interviewed Vargas with the assistance of a selection committee, which reported that she "indicated that she was working on certification in Math and Science because those were her areas of interest. She admitted to having fairly wéak background in grammar (grammar being a necessary component . . . since the teacher must supplement heavily in that area . . .).” Vargas, in her testimony to the arbitrator, denied having made these statements in her interview; she testified, according to the arbitrator’s account, that Spanish was her native language, that she was educated in Spanish through high school, that she had taught Spanish for twelve years, and that “while she expressed interest in Math and Science during her interview, that she did not indicate to the selection committee that she was not interest in teaching Spanish.” Principal Samaras denied Vargas’s application for transfer. After offering the position to the only other transfer applicant, who declined, he selected an outside candidate who required a certification waiver. That applicant obtained the required certification a few months later.
Norman Ham was the senior of two applicants for transfer to a history position at Lowell High School, for which he held the required certification. Principal Samaras had worked with Ham for seven years ending some ten years earlier, when Ham had been reassigned from the high school to a middle school. Samaras interviewed Ham with the assistance of a selection committee, which reported that Ham “did not respond to the questions... he chose to explain his philosophy of teaching which relates to the social needs of students. He discussed how he would relate his personal experiences to history ... he did not have an understanding of the current issues in History based on the curriculum.” For those reasons, Samaras rejected Ham’s transfer application. He also rejected the other transfer applicant because, as recounted by the Arbitrator, he and the selection committee “were dissatisfied with her familiarity with History, because she had not taught History for approximately ten (10) years.” Samaras chose an outside applicant who had been a substitute teacher in Lowell some thirteen years earlier, but had since worked in the banking industry.
Arbitrator Boulanger summarized the arguments of the parties, including the union’s contention that “the terms and conditions of Article XXVIII A require the Committee to select a transferee where he or she is a permanent teacher, minimally qualified pursuant to the contractual criteria, and where there is no competing internal applicant,” and the City’s contention, based on this Court’s 1997 ruling, that the agreement as so interpreted would conflict with c. 71, §59B.
The Arbitrator then explained his conclusions. He acknowledged the holding of School Committee of Lowell v. Local 159, Service Employees International Union, 42 Mass.App.Ct. 690, 692 (1997), that the authority over hiring granted to principals under c. 71, §59B, includes transfers as well as outside hires. He ruled, however, that that authority is limited by the transfer provisions of the collective bargaining agreement, which he characterized as “district personnel policies.” Thus, he ruled that those provisions do not conflict with the statute, and that “the grievance is substantively arbitrable . . . [and] properly alleges a violation of Article XXVIII A, which is not insulated from arbitral review.”
Arbitrator Boulanger acknowledged, however, that “the principal/superintendent’s authority to approve or disapprove a transferee must not be undermined by application of the terms and conditions of the collective bargaining agreement.” Thus, he concluded, “while the grievance is substantively arbitrable, the arbitrator’s scope of review is limited ... to whether or not the principals adhered to the procedures or the criteria for determining whether a teacher’s transfer request should be approved or denied.” In that regard, he concluded that Article XXVTII(A) requires principals to evaluate transfer applicants based on the criteria set forth in its paragraph three, and that “if a determination was made that two (2) candidates were equal concerning the above reference criteria, then the senior transfer applicant would be chosen for the position.” He then proceeded to define the “arbitrary and capricious” standard set forth in paragraph five of Article XXVIII(A) as meaning that “the rejection of the transferees and the resulting selection of the successful candidates will be reviewed to determine whether or not the principal’s decisions were rationally (based on the facts), contractually, and/or legally based.”
Arbitrator Boulanger then undertook to apply that standard to the decisions in issue. As to Lerer, he observed that “[i]t is-not known whether” the paragraph three criteria “were considered.” He noted the committee’s report of her interview, pointing out various aspects of it that he considered “unexplained,” and then commented that ”[w]hile the interview process is generally considered to be a necessary component of the employment process, in the case of an Article XXVIIIA transfer, it certainly does not end the procedure of candidate selection. Evaluations must be reviewed to determine the quality of teaching performance, and the skills required by the job ...”
Arbitrator Boulanger then addressed the fact he apparently considered of most significance: in order to *676 All the position with the outside candidate, rather than by transferring of Lerer, the City had to obtain a waiver of certification, since the outside applicant, “while certified in other subject areas, was not appropriately certified for the position.” Such a waiver was available, according to the applicable Department of Education (DOE) regulation, as quoted by Arbitrator Boulanger, upon request of the superintendent when compliance with the certification requirement “would in the opinion of the Commissioner constitute a great hardship in securing teachers for that district.” To obtain the waiver, the superintendent submitted a request on a DOE form. In response to the instruction to “(l]ist action(s) taken to recruit a certified person for the position,” the deputy superintendent indicated that “No certified applicants responded to advertising,” but did not disclose that a certified candidate had applied to fill the position by transfer. In response to an instruction to “(IJist each certified person who applied for the position and explain why he or she was not qualified . . .,” the deputy superintendent did not list Lerer because, according to the Arbitrator's summary of her testimony, “she did not consider Ms. Lerer’s transfer request as an application for the position because once her candidacy was rejected, the Administration sought new hires.” Characterizing this explanation as “disingenuous,” and questioning whether the Commissioner would have approved the waiver if informed of Lerer’s application, Arbitrator Boulanger concluded that the “the principal and/or Superintendent or his designee, acted in an arbitrary and capricious fashion when they obtained a waiver from a licensing requirement from a state agency by not accurately reporting the certification or licensing status of an incumbent employee with several years of service who sought the position ...”
As to Vargas, Arbitrator Boulanger noted the reasons given by the principal for his denial of her application, and observed that she had “credibly testified” to the contrary, but declined to resolve this factual dispute, relying instead, as in the case of Lerer, on his finding that “Mr. Samaras with the approval of the Superintendent and/or his designee defectively obtained a waiver for a non-certified teacher to fill the position.” The “defect,” again, was that the deputy superintendent responded to the items on the DOE form by indicating that “no fully qualified certified applicants responded to advertising," without disclosing Vargas’s request for transfer to the position. Arbitrator Boulanger concluded, as to both Lerer and Vargas, that “the Superintendent and/or his designees, applied the Article XXVIIIA criteria, particularly the certification factor, in an arbitrary and capricious fashion.”
The Arbitrator applied a different analysis in the case of Norman Ham. After noting the reasons given for Samaras’s rejection of Ham’s application, observing that “the interview is only one portion of the transfer request process pursuant to the Article XXVIII factors,” and noting the “satisfactory” ratings Ham had received on his evaluations, the arbitrator commented that “it is difficult, if not impossible, to reconcile the validity of Mr. Samaras conclusion that Mr. Ham was not current in historical issues based upon the curriculum, while [the outside applicant] would be acquainted with such issues based upon the curriculum when she has had no involvement in the curriculum or in teaching for some thirteen (13) years.” On this basis, the arbitrator concluded that the principal’s decision turned on the factor of “skills required by the job,” and that this factor “was applied to Mr. Ham and waived for” the outside applicant. Thus, the arbitrator concluded, “Mr. Samaras, the Superintendent, and/or his designee acted arbitrarily and capriciously by rejecting Mr. Ham’s transfer request.”
Arbitrator Boulanger ruled that the City had violated the collective bargaining agreement by denying the three transfer applications, as well as by the School Committee’s refusal to meet with the Union pursuant to level four of the grievance procedure. As a remedy, he ordered that the three transfers be approved, and further ordered that “the School Committee shall cease and desist from refusing to hear grievances at Level Four, including those grievances that allege a violation of Article XXVIIIA.” The Cityfiled Civil Action No. 99-3553 seeking to vacate that award on July 16, 1999; the Union responded with a counterclaim seeking confirmation of the award.
The issue of transfer rights under the collective bargaining agreement arose again in 1998, when Mary Lou Whalen applied for transfer to a third grade position at the Greenhalge School. Principal Albert Guimond, after conducting interviews with the assistance of a selection panel, chose to fill the position by approving the transfer request of Diane DeRosa, rather than that of Whalen. DeRosa, like Whalen, was a permanent teacher in a Lowell school, and had the necessary certifications, but she had less seniority than Whalen. In response to Whalen’s grievance, the School Committee again refused to meet with the Union pursuant to level four of the grievance procedure. The dispute came before Arbitrator Phillip Dunn, who issued a written decision dated October 12, 1999.[5]
Arbitrator Dunn began his analysis with the question of whether the dispute was arbitrable, concluding that it was because it “alleges a violation of the express language of article XXVIII,” and also because the parties were bound by the previous decisions of Arbitrators Cochran and Boulanger holding such disputes arbitrable. He held that the City’s claim of conflict between Article XXVIII, as interpreted in those decisions, and the Education Reform Act, was “a matter for the courts, not this arbitrator, to decide.”
Arbitrator Dunn then considered the. standard for his review of the principal’s choice between the two qualified transfer applicants, based on the “arbitrary *677 and capricious” test of Article XXVIII(A)(5). Quoting from his earlier decision in a Maine case, he construed that language to mean that “a reasonable decision (and therefore one that is not arbitrary or capricious) will identify the factors that properly may be considered; will develop facts reasonably necessary to reach a fair and informed conclusion with respect to those factors; and will be based upon those relevant factors and facts and not upon other, irrelevant considerations.”
Turning to the decision in issue, Arbitrator Dunn noted the apparently undisputed facts that Guimond and DeRosa had been lifelong personal friends, and that Guimond was also a personal friend of DeRosa’s husband, a principal of another Lowell school. Thus, he observed, “(t]here is a serious concern . . . that Principal Guimond either consciously or unconsciously, improperly based his decision . . . upon his lifelong friendship with Ms. DeRosa.” In order to determine whether that had occurred, despite the Principal’s testimony that it had not, the Arbitrator examined Guimond’s consideration of Whalen’s evaluations, teaching background, and interview performance.
As to Whalen’s evaluations, Arbitrator Dunn found that the principal’s characterization of them as “mediocre” was “flat-out wrong”; she had “routinely received the highest possible ratings from her evaluators, along with highly complimentary comments.” As to teaching background, the Arbitrator noted that Guimond erroneously testified that Whalen had been a Title I reading teacher of kindergartners “until only three or four years prior to the 1998 application,” when in fact she had been a classroom teacher since 1981; this error, the Arbitrator concluded, indicated Guimond’s failure “to inform himself thoroughly regarding the relevant qualifications.” As to interview performance, although Guimond testified that Whalen’s answers were “relatively short, matter of fact, not-definiüve, and with a heavy emphasis on environmental issues,”[6] the Arbitrator credited Whalen’s contrary testimony, based on Guimond’s “admittedly weak recollection” and Whalen’s notes compiled soon after the interview. The Arbitrator also noted Whalen’s master’s degree plus fifteen additional credits, as compared to DeRosa’s bachelor’s degree. Based on these findings, Arbitrator Dunn concluded that Principal Guimond “consciously or unconsciously permitted his lifelong friendship with DeRosa to cause him to select DeRosa over the grievant, who in fact was equally or more qualified than DeRosa.” On that basis, the Arbitrator found the decision arbitrary and capricious, in violation of Article XXVIII(A) of the collective bargaining agreement. He found a separate violation in the School Committee’s refusal to meet with the Union to hear the grievance pursuant to level four of Article III of the agreement. As a remedy, he ordered that the School Committee in the future “abide by its contractual obligation to hear and decide at Level Four grievances alleging violation of article XXVIII regarding inter-school transfer requests,” and that it “immediately grant” Whalen her requested transfer. The City filed Civil Action No. 99-5476, seeking to vacate that award, on November 10, 1999; the Union counterclaimed seeking to confirm the award.
DISCUSSION
The present motions, although labeled cross-motions for summary judgment,[7] call upon the Court to review the three arbitrator’s awards under the standards established by statute for such review, G.L.c. 150C, § 11(a). That statute empowers this court to vacate an arbitrator’s award only upon specified grounds, of which the City invokes only the one provided at § 11(a)(3); “the arbitrators exceeded their powers or rendered an award requiring a person to commit an act or engage in conduct prohibited by state or federal law.” The statute does not empower the Court to review an arbitrator’s award for error either of fact or of law. See School Committee of Waltham v. Waltham Educator’s Association, 398 Mass. 703, 705 (1986); School Committee of West Springfield v. Korbut, 373 Mass. 788, 792-93 (1977). Nor may the Court “review the arbitrator’s interpretation of the agreement, since that subject is committed to the arbitrator by the agreement.” School Committee of Norton v. Norton Teachers’ Association, 23 Mass.App.Ct. 1002, 1003 (1987), quoting School Committed of Hanover v. Curry, 369 Mass. 683, 685 (1976). Rather, the Court’s review “is confined to the question whether the arbitrator exceeded the scope of his reference or awarded relief in excess of his authority.” School Committee of Waltham v. Waltham Educators Association, 398 Mass. at 705-06, citing School Committee of West Springfield v. Korbut, 373 Mass. at 791-92. However, the issue of whether the arbitrator acted in excess of his authority “is always open for judicial review.” School Committee of Holbrook v. Holbrook Education Association, 395 Mass. 651, 654 (1985), quoting School Committee of West Springfield v. Korbut, 373 Mass. at 792.
The City’s contention here is that these awards exceed the arbitrators’ authority in that they deprive the school principals of the discretion conferred on them by statute to decide whom to hire for teaching positions in their schools. The City argues that G.L.c. 71, §59B, as amended by the Education Reform Act, supercedes Article XXVIII in its entirety, so that any arbitration proceeding or award based on that provision is unlawful. The City argues also that the remedies ordered, the transfer of the individual grievants, directly contravene the statutory allocation of hiring authority to each school’s principal.
As discussed supra, this Court previously addressed the meaning of c. 71, §59B, in its April 24, 1997, memorandum of decision in Civil Action No. 96-07012. In that decision, this Court construed §59B as applying to every decision to fill a vacancy in a *678 teaching position within a school, whether by transfer of a teacher already employed by the City, or by hiring of a new teacher from outside the system. This Court provided a full explanation of the reasoning underlying that ruling in its 1997 memorandum, which is incorporated herein by reference.
Nothing in the Union’s present arguments, nor anything that has occurred since then, warrants reconsideration of that ruling. To the contrary, just a few weeks after this Court issued that decision, the Appeals Court confirmed the correctness of its interpretation of the same statute by its decision in School Committee of Lowell v. Local 159, Service Employees International Union, 42 Mass.App.Ct. 690 (1997). In that case, the arbitrator had ordered the transfer of a custodian from one school to fill a vacancy in another, based on a collective bargaining provision apparently comparable to Article XXVIII. The Appeals Court held that the award exceeded the arbitrator’s authority, because it “directs a result contrary to §59B.” In construing that provision, the Court reasoned, “(bjecause it is apparent that the Legislature sought to give school principals the power to select all teachers and staff assigned to their school, subject to the approval of the school superintendent, we conclude §59B embraces transfers as well as new hires; otherwise, the principal’s power of selection would be thwarted.” Id. at 692.
In the wake of that decision of the Appeals Court, it is now beyond argument that the discretion conferred on school principals by §59B applies to transfers just as it does to new hires. The Legislature has given each principal authority to decide whom to appoint to any open teaching position within a school, choosing from among all qualified applicants, whether already employed in the City’s school system or not. Neither the superintendent nor the School Committee may usurp that authority, either directly by overruling its exercise in a particular case, or indirectly, by entering into a collective bargaining agreement that would effectively extinguish it or that would empower an arbitrator to overrule its exercise.
The Union acknowledges the Appeals Court’s decision in School Committee of Lowell, but nevertheless persists in arguing that §59B does not apply to transfers. Indeed, the Union urges this Court to “reconsider” the Appeals Court’s holding. Clearly, this Court has no power to “reconsider” a ruling of the Appeals Court, but rather is bound to follow it. The Union attempts to read some ambiguity into the Appeals Court’s decision, based on its citation, at 693, of Bradley v. School Committee of Boston, 373 Mass. 53, 56-58 (1977), which the Union reads as giving general approval to transfer provisions in collective bargaining agreements. This contention reflects a misunderstanding of both the holding in Bradley and the point for which the Appeals Court cited that case.
Bradley involved school principals who applied for transfer to principal positions in other schools within the City. The School Committee, as the arbitrator in that case found, had made a practice of exercising its statutory power of filling principal vacancies by approving transfer requests when recommended by the superintendent, and that practice had become incorporated into the collective bargaining agreement, giving rise to a contractual privilege in incumbent principals to be appointed to vacancies upon nomination by the superintendent. On the occasion in issue, however, the School Committee had abandoned that past practice, and adopted a new policy for filling all principal vacancies, involving a promotional rating procedure with community participation. Based on that new policy, the School Committee rejected the transfer applications, even though the superintendent had recommended their approval, and the Committee had never “voice[d] concern over the suitability of the proposed transfers." 373 Mass. at 60. The arbitrator ruled that this change of policy violated the collective bargaining agreement, and ordered the School Committee to follow its past practice. Noting the narrow scope of the award, particularly its careful avoidance of any infringement on the superintendent’s decision whether to recommend approval, the Supreme Judicial Court held it within the arbitrator’s authority, even though it “effectively orders approval of the . . . transfer requests,” because “[i]f [the arbitrator] finds that procedures or practices agreed to by the parties have not been complied with, he may order that the omitted procedure or practice be followed.” 373 Mass. at 59.
In School Committee of Lowell, after ruling that the transfer provision in the collective bargaining agreement “must yield to §59B,” the Appeals Court went on to observe that its decision did not “invalidate those provisions of the parties’ collective bargaining agreement which established the process for filling vacancies ... so long as the prior approval which was vested in the school committee rests now with the principal and superintendent. . . We do not perceive the procedures for filling vacancies to infringe upon the powers of the principal and superintendent so long as they retain the right of approval of the employee selected pursuant to those procedures.” Id. at 693. For this proposition, the Appeals Court cited Bradley.
The citation, read in context, is entirely consistent with the Appeals Court’s construction of §59B, and conveys no suggestion that an arbitrator could properly order approval of a teacher’s request for transfer under that statute, nor does the Bradley decision itself stand for any such proposition. Bradley was decided long before enactment of the current version of §59B, and the Appeals Court’s holding is directly to the contrary; its citation of Bradley is for the much narrower point that collective bargaining provisions affecting only the procedure for filling vacancies, and not the substance of any hiring decision, may survive §59B and remain enforceable. See School Committee *679 of Holbrook v. Holbrook Education Association, 395 Mass. at 655 (“bargained for procedures governing the appointment and reappointment of teachers, such as posting and evaluation requirements, are specifically enforceable," but arbitrator’s award ordering school committee to recall individual teacher to particular position exceeded authority); School Committee of West Springfield v. Korbut, 373 Mass. at 796 (contractual requirement of notice and hearing before disciplinary non-renewal held enforceable as procedural; order of one-year renewal as remedy for violation held within arbitrator’s authority); School Committee of Danvers v. Tyman, 372 Mass. 106, 113 (1977) (“Although a school committee my not surrender its authority to make tenure decisions, there is no reason why a school committee may not bind itself to follow certain procedures precedent to the making of any such decision”); compare Berkshire Hills Reg. School Dist. Comm. v. Berkshire Hills Educ. Ass’n., 375 Mass. 522, 528 (1978) (staying arbitration of claimed Violation of contract provision granting district employees preference over outsiders for principal position, because such preference conflicted with school committee’s non-delegable authority, and was not “a question of adherence ... to procedures”).
The Union’s fail-back position here rests on the statutory requirement that principals act “consistent with district personnel policies.” It argues that Article XXVIII, even if construed as imposing an absolute preference for transfers over outside hires, is merely a “personnel policy,” which §59B expressly authorizes the School Committee to adopt by agreement and to impose on principals. It relies again on Bradley, reading that decision, and the Appeals Court’s citation to it in Lowell School Committee, as treating a contractual transfer preference as merely procedural.
Here again, the Union over-interprets Bradley, and ignores the holding of School Committee of Lowell. Bradley did not establish a general rule that transfer provisions of collective bargaining agreements are matters of procedure only. Rather, the Court held only that in the particular circumstances of that case, where the power of appointment was in the same body that had entered into the collective bargaining agreement, and where the superintendent had exercised his judgment to recommend each transfer applicant, the School Committee could bind itself in contract to continue its past practice of accepting the superintendent’s recommendation. Here, as in the case before the Appeals Court in School Committee of Lowell, the power of appointment is allocated by statute not to the School Committee, which enters into the collective bargaining agreements, but to each principal, none of whom has approved the particular transfers in issue. In this context, the Appeals Court concluded that the transfer provision enforced by the arbitrator in that case “is in conflict with §59B.” 42 Mass.App.Ct. at 692. Although the Appeals Court did not discuss the statutory language on which the Union now relies, its holding leaves no room for an interpretation of that phrase so broad as to encompass a contractual right in any teacher, or other employee whose hiring falls under §59B, to transfer into a school over the principal’s objection.
This Court’s April 1997, decision recognized that procedural requirements may survive, and that the collective bargaining provisions in issue here are susceptible of various interpretations, some of which would impose solely procedural rights and obligations. The Court recognized also that interpretation of the agreement is for the arbitrator, not the Court. Accordingly, the Court rejected the School Committee’s request for an order staying the then pending arbitration, so as to allow the arbitrator an opportunity to construe the agreement and to order a remedy for any violation found under such construction, subject then to judicial review of any relief awarded pursuant to the statutory standard. See School Committee of Danvers v. Tyman, 372 Mass. at 115.
The Court’s task now is to determine whether the agreement, as construed by the arbitrators in these cases, is consistent with the statute. If it is not, then any relief awarded by the arbitrators for its violation exceeds their authority, and must be vacated. If the agreement as construed is consistent with the statute, the Court must then consider whether the relief awarded is within the arbitrator’s authority. See School Committee of Boston v. Boston Teachers Union, Local 66, 378 Mass. 65, 69 (1979) (issue defined as “whether the enforcement of the terms of the collective bargaining agreement, as interpreted by the arbitrator, improperly intrudes into an area reserved for the judgment of the school committee regarding education policy”); see also School Committee of Holbrook v. Holbrook Education Association, 395 Mass. 651, 654 (1985).
1. The Cochran Award.
The task is a fairly easy one in the case of the decision of Arbitrator Cochran. Without ever saying so directly, her decision leaves no room for doubt that she interprets Article XXVIII as granting qualified permanent teachers a contractual right to fill any vacant position by transfer upon timely application, regardless of any discretionary judgment of the school principal. The Court has no power to review that interpretation, but must accept it and proceed to consider whether Article XXVIII, as so interpreted, conflicts with the statute. Clearly, under the Appeals Court’s holding in School Committee of Lowell, and for the reasons discussed supra, it does. See Berkshire Hills Reg. School Dist. Comm. v. Berkshire Hills Educ. Ass’n., 375 Mass. at 523 (collective bargaining provision granting district employees preference over outside applicants for supervisory positions held invalid under earlier statute). Accordingly, this aspect of the decision of Arbitrator Cochran must be vacated.
*680 Arbitrator Cochran found a second violation in the School Committee’s refusal to meet at level four of the grievance procedure, as required by Article III of the agreement, although she awarded no separate remedy for this violation. The City does not argue that Article III conflicts with any statutory provision; its position, rather, is that an alleged violation of Article XXVIII fails to trigger the grievance procedures of Article III, because Article XXVIII is a nullity, having been super-ceded in its entirety by c. 71, §59B. This is the same argument this Court rejected in 1997 in denying the requested stay of arbitration. Nothing in the City’s present arguments, or in any subsequent events, persuades the Court to change its view. Nevertheless, the award of Arbitrator Cochran must be vacated in its entirety, because the only remedy she ordered, requiring approval of the transfers, exceeded her authority.
2. The Boulanger Award.
The decision of Arbitrator Boulanger leaves somewhat more uncertainly as to his interpretation of the agreement. His stated interpretation is that Article XXVIII(A) requires principals to evaluate transfer applicants based on the criteria set forth in its paragraph three, and that “if a determination was made that two (2) candidates were equal concerning the above reference criteria, then the senior transfer applicant would be chosen for the position.” Further, he construes Article XXVTIKA) as prohibiting arbitrary and capricious decision-making, which he defines as meaning that “the rejection of the transferees and the resulting selection of the successful candidates will be reviewed to determine whether or not the principal’s decisions were rationally (based on the facts), contractually, and/or legally based.”
Arbitrator Boulanger’s analysis of the three cases before him elucidates the meaning of this language. As to the first two, after expressing his own disagreement with the principals’ reasons for rejecting the transfer applicants, but purporting not to rely on that disagreement, he found illegality in the deputy superintendent’s applications for certification waivers for outside applicants. Thus, as interpreted by Arbitrator Boulanger, Article XXVIII encompasses review by arbitration not only of each principal’s decision to disapprove a transfer, but also of the superintendent’s handling of applications for certification waivers. As to the third case, that of Norman Ham, Arbitrator Boulanger found arbitrariness in the principal’s rejection of the transfer because, in the Arbitrator’s view, the outside candidate's career history indicated that she could not have the particular qualityfamiliarity with the substance of the curriculumfor the lack of which the principal had criticized Ham.[8] Thus, the arbitrary and capricious standard of Article XXVIII, as construed by Arbitrator Boulanger, empowers the Arbitrator to review the principal’s weighing of indisputably relevant factors in comparing applicants.
Arbitrator Boulanger’s approach, based on his interpretation of Article XXVIII, intrudes on the discretion granted to principals by statute in a three separate respects. First, his stated interpretation requires that principals decide based only on the criteria set forth in paragraph three of Article XXVIII. The statute, however, does not so limit the principal’s discretion by its terms, nor would such a limitation be consistent with its purpose. If principals are to fulfill the managerial responsibility assigned to them by the Education Reform Act, and to bear responsibility for the outcome of their decisions in the performance of their schools, they must have broad discretion to consider all lawful and relevant factors, including subjective factors not susceptible of precise measurement, and to weigh those factors according to their own judgment. As this Court said in its April 1997, memorandum, §59B reflects legislative recognition “that teachers are not mere laborers, who might be viewed as fungible as long as they meet a minimal level of competence and diligence; teachers are professionals, whose individual strengths, skills, and approaches, in combination with those of the other members of a school’s faculty, determine more than any other factor the character and quality of a school.” A collective bargaining agreement that would constrain a principal’s consideration to the factors set forth in paragraph three of Article XXVIII could effectively prevent a principal from assembling the team of professionals best suited, in the principal’s honest judgment, to achieve the goals set by that principal for the operation of that school. Thus, Arbitrator Boulanger’s award, insofar as it rests on Article XXVIII as so interpreted, exceeds the Arbitrator’s authority.
Arbitrator Boulanger’s reliance on the applications for waiver certification also exceeds his authority. Nothing in the collective bargaining agreement, or in any other identified source, empowers the Arbitrator to review such applications, to evaluate the adequacy of the information conveyed by the deputy superintendent to the Commissioner of Education, or to speculate, as the Arbitrator does, as to how the Commissioner would have responded if given additional information.[9] The facts as found by the arbitrator indicate that in each of these cases, the principal declined to approve the transfer, for reasons based on the principal’s judgment of the applicant’s interview performance and other educationally relevant factors. Although the Arbitrator expressed some doubts and disagreements, he made no finding that the reasons given by the principals were not the real reasons. Nothing in the facts as found suggests, in either case, that the principal relied on any irrelevant or unlawful factor. Having disapproved the transfer, each principal then chose an outside hire whom the principal apparently deemed the overall best candidate, despite a deficiency in the one factor of certification. The weighing of factors among candidates is precisely the sort of managerial decision that the statute allocates to principals, and no one else. See School Committee of Peabody v. International union of Elec. Radio & Ma *681 chine Workers, 19 Mass.App.Ct. 449, 454 (1985) (vacating award where “(t]he arbitrator has purported himself to decide the relative qualifications”of candidates). The Arbitrator’s decision in these cases effectively substitutes the Arbitrator’s judgment that certification is to be weighed more heavily than the subjective considerations the principals cited. If Article XXVIII authorizes such substitution of judgment, it contravenes §59B, and must yield to that provision.
The Arbitrator’s ruling in the case of Norman Ham reflects the same type of substitution of judgment. The facts as found by the Arbitrator indicate that the principal declined to employ Ham, with whom he was well acquainted from prior direct work experience, and whose interview performance he had evaluated with assistance from a selection panel. The Arbitrator made no finding that the reasons the principal gave were not the real reasons, or that any unlawful or irrelevant factor played any part in the principal’s decision. His conclusion, rather, was that the principal could not, consistently with Article XXVIII, give the factor of familiarity with the curriculum different weight in evaluating two candidates. The Education Reform Act, however, allocates to the principal, not the arbitrator or any one else, discretion to weigh factors in choosing among candidates. Article XXVIII, if construed to limit that discretion, conflicts with the statute, and any award based on it exceeds the Arbitrator’s authority.[10] Accordingly, Arbitrator Boulanger’s award must be vacated insofar as it is based on his findings of violations of Article XXVIII.
Insofar Arbitrator Boulanger’s award rests on a finding of violation of Article in of the collective bargaining agreement, it may stand, for the same reasons already discussed with respect to Arbitrator Cochran’s award. Unlike Arbitrator Cochran, Arbitrator Boulanger ordered a separate remedy for this separate violation, in the form of a cease and desist order. The City has identified no conflict between this aspect of the award and §59B, or any other statutory provision. Accordingly, this aspect of the award must be confirmed.
3. The Dunn Award.
The case before Arbitrator Dunn called upon him to construe the agreement only as to the arbitrary and capricious standard of paragraph 5 of Article XXVIII, as applied to a choice between transfer applicants. That provision, he ruled, requires principals to identify relevant factors, to “develop facts reasonably necessary to reach a fair and informed conclusion with respect to those factors,” and to decide “based upon those relevant factors and facts and not upon other, irrelevant considerations.” In applying that test to the case before him, he undertook to determine as a factual matter whether the principal had met that standard, or instead had allowed an irrelevant factor, personal friendship with a competing applicant, to unfairly influence his decision. Arbitrator Dunn based his conclusion on his factual finding that the principal had decided based on personal friendship.
The process by which Arbitrator Dunn reached that factual determination raises serious concerns. An arbitrator’s independent review of an employee’s evaluations poses considerable risk of the arbitrator substituting his own interpretation of those documents for that of the principal.[11] Similarly, an arbitrator’s taking testimony and making credibility judgments about what occurred in an interview risks the arbitrator substituting his evaluation of the employee’s interview performance for the principal’s, without even having been present at the interview. The law is clear, however, that an arbitrator is empowered to take evidence and find facts on a disputed factual issue that is subject to arbitration, and the Court is bound by the facts found. See School Committee of Waltham v. Waltham Educator’s Association, 398 Mass. at 705, 708.
The question raised by Arbitrator Dunn’s finding of violation, then, is whether Article XXVIII, as construed by Arbitrator Dunn, is so intrusive on the principal’s managerial discretion as to contravene the statute. Put differently, the issue is whether the legislature authorized principals to make hiring decisions based on factors, such as personal friendship, that are clearly irrelevant to any legitimate management objective, even if not unlawful. Certainly the legislature could have done so, and it is not difficult to articulate reasons why it might, chief among which would be to protect legitimate exercises of discretion against the potential risks of the kind of review Arbitrator Dunn conducted. Nevertheless, such absolute discretion, shielded from even the most deferential review, is unusual in the public sector. In the absence of unequivocal language to that effect, this Court does not construe the statute in that manner. See generally, Blue Hills Regional School District Committee v. Flight, 383 Mass. 642, 644 (1981) (denial of promotion based on sex justified exception to non-delegabilify doctrine). Accordingly, the Court will confirm Arbitrator Dunn’s award insofar as it finds a violation of Article XXVIII in the principal’s selection of Diane DeRosa over Maty Lou Whalen, as well as insofar as it finds a violation of Article III and orders future compliance with that provision.
The remedy ordered by Arbitrator Dunn for the violation of Article XXVIII requires separate consideration, however. In ordering that the “School Committee immediately grant the grievant her requested transfer,” the Arbitrator directed the School Committee to act beyond its statutory authority under §59B, which empowers only principals to hire teachers into their schools. In contrast to the situation in Bradley, 373 Mass. at 60, the facts as found by the Arbitrator do not indicate that Principal Guimond, as the statutorily authorized decision-maker, ever approved Whalen’s transfer, or made a judgment that he would choose to employ her in his school. See School Committee of Peabody v. International Union of Elec., Radio, & Machine Workers, 19 Mass.App.Ct. 449, 454 (1985) (distinguishing Bradley on similar ground). It may be *682 that he would have done so if not for his favoritism toward the competing candidate, but that judgment remains his to make. See School Committee of Springfield v. Springfield Administrators' Association, 36 Mass.App.Ct. 916, 916 (1994) (“an arbitrator may not order the appointment of a particular person to a particular academic position in a school system”). Accordingly, the award of Arbitrator Dunn must be vacated insofar as it orders the granting of Whalen's transfer request, and the matter remanded for further consideration as to the appropriate remedyfor the violation found. See G.L.c. 150C, § 11(c) (“court may order a rehearing before the arbitrators who made the award”); Higher Education Coordinating Council v. Massachusetts Teachers' Association, 423 Mass. 23, 33 (1996) (ordering remand to arbitrator where remedy exceeded authority); School Committee of Danvers v. Tyman, 372 Mass. at 114 (discussing permissible remedies available to arbitrator, short of ordering grant of tenure, for violation of procedural requirements for tenure decision).
CONCLUSION AND ORDER
For the reasons stated, the Court hereby orders that JUDGMENT enter as follows: In Civil Action No. 97-3410, the arbitrator’s award is VACATED. In Civil Action No. 99-3353, the arbitrator’s award is CONFIRMED as to its first paragraph, which orders that “(t]he School Committee shall cease and desist from refusing to hear grievances at Level Four, including those grievances that allege a violation of Article XXVIII A,” and VACATED as to its second paragraph, which orders that ”[t]he Superintendent and/or the principal of the High School shall forthwith approve the transfer requests of Norman Ham and Bertha Vargas" and that “(t]he Superintendent and/or the principal of the Cardinal O’Connell School shall forthwith approve the transfer request of Ms. Jill Lerer.” In Civil Action No. 99-5476, the arbitrator’s award is CONFIRMED as to the first sentence of paragraph [3], which orders that “(t]he School Committee in the future shall abide by its contractual obligation to hear and decide at Level Four grievances alleging violation of article XXVU3 regarding inter-school transfer requests,” and VACATED as to the second sentence of that paragraph, which orders that “(t]he School Committee shall immediately grant the grievant her requested transfer to a grade three teaching position at the Greenhalge Elementary School,” and the matter is ordered REMANDED to the Arbitrator for rehearing to determine an appropriate remedy, within the Arbitrator’s authority, for the violation of Article XXVIII, as found by the Arbitrator.

The language set forth is that contained in the version of the agreement in effect at the time of the disputes presented in these cases, as amended effective October 12, 1995. It appears that substantially similar language was included in previous versions of the collective bargaining agreement.

The phrase “athletic coaches" was added to §59B by St. 1996, c. 134, §2, approved June 26, 1996. See School Committee of Natick v. Education Association of Natick, 423 Mass. 34, 40 (1996) (regarding superintendent’s non-delegable authority to appoint athletic coaches, under statute as in effect before amendment transferring that authority to principals).

Although the Arbitrator’s award is dated a month after this Court’s decision on the City’s request for stay of arbitration, it appears that the Arbitrator did not have the benefit of that decision, as she noted that the Court had taken the case under advisement before the arbitration hearing, and had “neither ordered the parties to proceed to arbitration nor ordered that the arbitration not proceed.” She apparently also did not have the benefit of School Committee of Lowell t). Local 159, Service Employees International Union, 42 Mass.App.Ct. 690, 692 (1997), issued just the day before her award, in which the Appeals Court construed §59B in the same manner as this Court had a few weeks earlier.

The Union initially took the position that this action, as well as No. 99-3353, should be dismissed as untimely filed, but expressly waived that contention at oral argument on the present cross-motions for summary judgment. But see Garrett v. Director of the Division of Employment Security, 394 Mass. 417, 420 (1985) (affirming dismissal of administrative appeal because not received by clerk’s office within limitations period).

The Arbitrator’s decision does not describe the hearing or give its date, but refers to “testimony” of the principal.

The Arbitrator observed that this criticism “verges on the bizarre,” since the school “has as its theme environmental education.”

Motions for judgment on the pleadings, rather than summary judgment, might have been a more appropriate and expeditious vehicle for bringing the dispute before the Court for resolution. See City of Gloucester v. Civil Service Commission, 408 Mass. 292, 296-297 (1990). The materials presently before the Court do not explain either the parties’ delay in bringing the present motions until April 10, 2000, or the delay in hearing on the motions from that date until October 26, 2000.

The Arbitrator did not actually make a finding as to whether she did or did not have that familiarity, nor did he identify any evidence from which he could have made any such finding. Rather, he proceeded directly from the fact of her work in the banking industry to the conclusion that the principal must have waived this factor for her.

The Arbitrator’s suggestion that full disclosure might have led to denial of the waiver requests is open to serious doubt. The DOE regulation refers to “hardship in securing teachers for the district,” not for the particular school. It appears, on the facts as found by the arbitrator, that approval of the transfers would not have eliminated the hardship to the district, but would merely have transferred the vacancies, for which no certified applicants had applied, from the schools to which the grievants sought to transfer to the schools where they had worked. The District, it appears, would still have needed waivers to fill the vacancies created by the transfers.

Principal Samaras’s decision may reflect exactly the kind of managerial judgment that the statute intends to promote. A principal might rationally conclude that lack of familiarity with the curriculum warrants more serious concern when demonstrated by a long-time teacher, already employed in the district and in a position to develop such familiarity, particularly when combined with interview answers indicating a focus on “the social needs of students” and “his personal experiences," than does the same lack of familiarity in an applicant from a different type of background, whose experience might bring other benefits to the school, and who demonstrates a willingness and ability to develop the necessary familiarity promptly after hire.

As anyone who has ever written employee evaluations knows, their interpretation tends to require reading between the lines. Clearly, under the Education Reform Act, if anyone is to do so, it is the principal.